IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

STEPHEN WADDELL,

                Plaintiff,         Case No. 3:06 CV 1405

-vs-

                                          MEMORANDUM OPINION

MEDICAL UNIVERSITY OF OHIO, et al.,

                Defendant.

KATZ, J.

This matter is before the Court on the defendants' motion for summary judgment (Doc. 30), the plaintiff's response (Doc. 31), and the defendants' reply (Doc. 32). This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

**I. Background**

Plaintiff Stephen Waddell, an African-American male, began his employment at Defendant Medical University of Ohio ("MUO") on October 1, 1973 as a custodial worker. He took some college courses after high school, but did not earn a college degree. Waddell received several promotions at MUO, and in 1999 he was named Director of Environmental Services, in which capacity he supervised 110-140 employees and oversaw the cleaning and janitorial services throughout MUO's 1,300,000 square foot facility. He received generally positive reviews throughout his tenure. Waddell also had three to five subordinates who were supervisors of the other employees within Environmental Services. Those subordinate supervisors had the authority to reprimand their subordinates, and Waddell had the authority to suspend or terminate any

subordinate employees. He typically coordinated such decisions with the Human Resources Director, William Logie.

Charles Lehnert, a Caucasian, who was Maintenance Department Director and Waddell's supervisor beginning around 2001, on occasion overruled Waddell's disciplinary decisions. At some point, approximately a year after Lehnert became Maintenance Director, he began attending Corrective Action Review Board ("CARB") hearings for Waddell's subordinates. Waddell took Lehnert's attendance, and Lehnert and Logie's override of several of Waddell's disciplinary decisions, as a lack of confidence in his management. Waddell complains that on some occasions – including the appointment of a subordinate to a labor committee, the promotion of a painter to a supervisor, and the reassignment of Waddell's secretary – Waddell was left out of making important personnel decisions. Waddell also complained about staffing problems. In one instance, Lehnert refused to permit injured custodians to perform light duty, after an injured employee reinjured himself performing light duty. Waddell also complained that the decisions were racially motivated in that his department was 70% African-American.

At some point in 2001 or 2002, a picture of three monkeys in suits was left on Waddell's desk by an unknown person or persons. Waddell documented the incident and brought it to the attention of Samuel Hancock, MUO's Assistant to the President for Institutional Diversity, an African-American.

In 2003, Waddell asked for a raise because he considered himself underpaid compared to people in similar positions at other institutions. MUO's Human Resources Department conducted a market value analysis review that resulted in a 5% raise for Waddell. In 2004 and 2005, Waddell received 2% raises as part of across-the-board adjustments at MUO. In mid-2004, MUO

2

raised some salaries that fell below the 80th percentile of market salary, but Waddell did not fall into that category. Other managers did have higher salaries than Waddell, but MUO contends that those individuals had technical certifications or advanced degrees that Waddell lacked and that they supervised more specialized subordinates than Waddell's.

On July 17, 2003, Waddell began a medical leave for knee surgery and left Supervisor Cindy Klostermeier, who is Caucasian, in charge. While Waddell was on leave, Klostermeier informed him that custodian James Obong was caught sleeping in MUO's fitness facility, the Morse Center, while working overtime. Waddell testified that he understood that Lehnert and/or Logie had decided, in Waddell's absence, to terminate Obong. Waddell Depo. at 54. On or about August 1, 2003, Lehnert informed Waddell by telephone that, as a result of statements made by Obong and review of video surveillance, eight custodial workers had been terminated on July 1, 2003 for "screwing off in the Morse Center playing basketball and doing just whatever." Waddell Depo. at 13. Klostermeier later told Waddell that Lehnert had instructed her not to tell Waddell about the terminations, at least before Lehnert had. Waddell Depo. at 16, 159. Two Caucasian custodial workers were on tape in the Morse Center, one to restock his cart, and the other was speaking about a book or magazine with another worker for about five minutes. The latter received a written reprimand.

Waddell returned from leave on August 4, 2003. He and others from the Environmental Services staff attended CARB hearings for the eight custodians. During a break, Lehnert asked Waddell to be more vocal in support of the terminations. Waddell more actively questioned the custodians thereafter, testifying that he did so for fear of his job. Waddell complains in retrospect

3

that the firings should not have been made without him, as they affected his staff, and claims that African-American employees were being disciplined more harshly than others.

One or two months after the terminations, Logie asked Waddell to be available to be interviewed by a local television station, which had found the discharge of the eight custodians newsworthy. After the interview aired, Waddell received calls from friends and relatives calling him an "Uncle Tom," and "sellout" for what he construed to be MUO presenting him as a "black face" to the public to support the terminations and representing MUO as a positive workplace for African-Americans. Waddell contends it became a joke amongst MUO employees that he was a "sellout." Waddell Depo. II at 169-74.

In December 2004, Hancock and MUO Legal Counsel Kim Kondalski asked Waddell to submit a statement to the Ohio Civil Rights Commission ("OCRC") describing MUO as a fair place to work in defense to charges of discrimination filed by the eight terminated custodians. Waddell agreed to draft this letter and forwarded it to Kondalski. Kondalski phoned Waddell and told him she "would need more than that," and to state he was in agreement with the terminations. Waddell complained to Hancock, Logie and Lehnert, that someone else other than Waddell should make such a statement on behalf of MUO, because he did not support all of the terminations. However, out of fear of losing his job, Waddell composed a second statement, which concluded, "I support the recommendation of termination of these employees and the way these incidents were handled by M.C.O." Waddell Depo. II at 189-92, Ex. B.

At an OCRC hearing on the firings, Waddell, asked to attend by Logie and briefed by Kondalski, was questioned extensively about why the African-American employees were fired and the Caucasian ones were not. OCRC Chairperson Aaron Wheeler "ranted and raved" and

4

"tongue-lashed" Waddell, asking him how he could let this happen and why the black employees were fired and white employees who appeared on the surveillance footage were not. Waddell Depo. II at 178-82. Waddell tried to explain he had been on medical leave when the decisions were made, causing Wheeler to inquire, "[T]hen why are you here, where are the people that fired these people." Waddell Depo. at 32-33. Waddell felt that he was made a spectacle of by the OCRC and was viewed as a sellout to his race. When Waddell returned to MUO, Lehnert was apologetic and told Waddell that he "shouldn't have had to take all that shit" that the OCRC gave him. Waddell Depo. II at 178-83.

Also in December 2004, Mark Chastang, African-American, was named CEO of the MUO Hospital. Chastang was dissatisfied with the cleanliness of the Hospital and performance of the custodial staff, and he wanted to upgrade the management of Environmental Services. A position was created that included supervision of Environmental Services and painting. The plan, however, was that if Waddell were not the successful candidate, he would be given a new job at no loss of pay or benefits. Waddell was informed he would no longer report to Lehnert and he was to report directly to Dick Sipp, a Caucasian and MUO's Vice President of Operations. Waddell was "happy" about the change as he had a positive working relationship with Sipp in the past. Waddell Depo. II at 245. After only two or three weeks, Sipp informed Waddell he was leaving MUO, which caused Waddell to be "nervous" and "devastated," and his new supervisor was unnamed. Waddell Depo. II at 245-46. Meanwhile, Waddell was working 12-hour days because he felt as if he were being "undermined" and needed to "stay on top of what's happening." Waddell Depo. II at 232-33. He apparently knew nothing of the plan to upgrade his position.

5

Also in December 2004, Waddell saw a classified ad in the Toledo Blade for the position of "Director of Environmental Services" at MUO. Waddell Depo. II at 235-36, Ex. F. According to Waddell, Logie and Lehnert directed him to Dixon, who said the error was "typographical," but the ad reappeared in January 2005. Waddell Depo. II at 238-39. Dixon told Waddell that the actual "mistake" was the failure to make sure Sipp had explained the situation to Waddell before the ad was placed. Dixon Aff., ¶¶ 10-11. Waddell was quite overwrought, "screaming and yelling," could not get an explanation from anyone else, and did not think it worthwhile to talk to Sipp after being referred to him. Waddell Depo. II at 239-41. "I wasn't thinking straight, to be honest." Waddell Depo. II at 245. Waddell filed his first charge of discrimination with the OCRC on January 27, 2005, alleging race discrimination in pay throughout his tenure as Director. In January, 2005, Waddell took a medical leave of absence due to "depression, anxiety and stress," and because he could not "tolerate the betrayal" and "lies." (Waddell Depo. II at 242-43. On July 19, 2005, Waddell filed his retirement application with the Ohio Public Employees Retirement System ("OPERS"), to be effective October 1, 2005. Arlene Brackette, who is African-American, replaced Waddell in an acting capacity. OPERS notified Waddell that his application was accepted and he should received his first paycheck "a minimum of thirty days after October 1, 2005." Waddell Depo. II at 256, Ex. H. Waddell received his first paycheck on November 8, 2005.

Waddell filed his second OCRC charge on November 30, 2005, and his third charge on December 9, 2005, alleging that he was harassed and/or constructively discharged and that he was denied equal pay due to his race. He filed a complaint before this Court on June 7, 2006, alleging

6

pay discrimination, constructive discharge, and retaliation under Title VII against MUO; and liability under 42 U.S.C. §§ 1981, 1983, 1985, and 1986 against the individual defendants.

**II. Summary Judgment**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; see also *Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing

7

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; see also *Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

**III. Discussion**

Waddell's allegations against MUO include pay discrimination, constructive discharge, and retaliation under Title VII. Against Logie, Leonard, and Hancock, Waddell alleges individual liability under 42 U.S.C. §§ 1981, 1983, 1985, and 1986.

**A. Title VII claims against MUO**

It is unlawful under federal law for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

8

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), set forth the order for the presentation of proof in a Title VII case, which first requires a plaintiff to establish, by a preponderance of the evidence, a prima facie case of discrimination by direct or circumstantial evidence.

Direct evidence is found, for instance, where an employer's policy is discriminatory on its face, *see Trans World Airlines, Inc., v. Thurston*, 469 U.S. 111, 121 (1985), or where a corporate decision-maker expressly states a desire to remove employees in the protected group, *see LaPointe v. United Autoworkers Local* 600, 8 F.3d 376, 379-80 (6th Cir. 1993). In direct evidence cases, once a plaintiff shows that the prohibited classification played a motivating part in the employment decision, the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even had it not been motivated by impermissible discrimination. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-45 (1989) (plurality opinion); *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994).

Where no direct evidence of discrimination exists, an employee can establish his/her prima facie case by indirect or circumstantial evidence. In that instance, he/she must show (1) that he/she is a member of the protected class; (2) that he/she was denied opportunities or experienced an adverse employment decision; (3) that he/she was otherwise qualified; and (4) that other individuals outside the protected class received more favorable treatment. *See Siegel v. Alpha Wire Corp.*, 894 F.2d 50, 53 (6th Cir. 1990); *Gagné v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 313 (6th Cir. 1989). Having met that burden, a presumption arises to the effect that the employer

unlawfully discriminated against the plaintiff. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981). The burden of production then "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for the less favorable treatment. *See McDonnell Douglas*, 411 U.S. at 802.

Where the defendant sets forth, through the introduction of admissible evidence, that the actions were taken for a legitimate nondiscriminatory reason, it becomes the plaintiff's burden to prove by a preponderance of the evidence that the reason was actually a pretext for discrimination. To establish pretext, a plaintiff may meet his or her burden by showing that the adverse employment action: (1) had no basis in fact; (2) was insufficient motivation for the employment action; or (3) did not actually motivate the adverse employment action. *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6 Cir.1994). In circumstantial evidence cases, the burden of persuasion remains at all times with the employee. *Gagné*, 881 F.2d at 315-16.

It is also unlawful under Ohio law "[f]or any employer, because of the race, color, religion, sex, national origin, disability, age, or ancestry of any person to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." Ohio Rev. Code § 4112.02(A). The Ohio Supreme Court has held that the coverage of § 4112.02(A) is identical to the coverage of federal law prohibiting discrimination in the employment context. Thus, evidence sufficient to support a finding of discrimination under Title VII of the Civil Rights Act of 1964 is necessary before a violation of § 4112.02(A) can be demonstrated. *See Genaro v. Central Transp., Inc.*, 84 Ohio St.3d 293 (Ohio 1999); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St.2d 192, 196

(1981); *see also, Little Forest Medical Ctr. of Akron v. Ohio Civil Rights Comm'n*, 61 Ohio St.3d 607, 609-10 (1991).

### 1. Employment discrimination and retaliation

Plaintiff asserts claims of discrimination and retaliatory discharge.[1] When there is no direct evidence showing that an employer terminated an employee specifically for engaging in protected activity, the Court analyzes a retaliation claim under a framework mirroring that of employment discrimination claims based on circumstantial evidence, as discussed above. First, the Court must determine whether the employee has made out a prima facie case by showing that: (1) he engaged in protected activity; (2) he experienced an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action. *White v. Mt. Carmel Med. Ctr.*, 150 Ohio App.3d 316, 328 (Ohio Ct. App. 2002). If the plaintiff meets that burden, the Court must determine whether the employer has articulated a legitimate, non-discriminatory reason for firing him. *Kilbarger v. Anchor Hocking Glass Co.*, 120 Ohio App.3d 332, 697 N.E.2d 1080, 1083 (1997). Then the plaintiff may establish pretext as discussed above.

The central allegation in Waddell's discrimination and retaliation claims appears to be that MUO used him because of his race to justify to observers the legitimacy of the eight custodial firings made during his absence, as well as the monkey picture on his desk. He would have to show that such actions by MUO constituted an adverse employment action. If those actions did

---

[1] Plaintiff's brief, through counsel, does not lay out a full argument providing evidentiary support to apply the governing law to the facts of his case. Rather, it briefly directs the Court to various portions of Defendant's motion and argues with little or no legal authority that they deserve trial. *See generally*, Doc. 31. The Court herein takes what it can from the pleadings and poses the arguments apparently intended to be made.

11

constitute adverse employment actions, Waddell would also have to show that MUO's stated non-discriminatory reasons for its actions either (1) had no basis in fact; (2) were insufficient motivation for the employment action; or (3) did not actually motivate the adverse employment action

An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998). A plaintiff may show that an adverse employment action was taken by demonstrating that he or she was constructively discharged. *Logan v. Denny's*, 259 F.3d 558, 568-69 (6th Cir. 2001). To demonstrate a constructive discharge, Plaintiff must show that 1) "the employer . . . deliberately created intolerable working conditions, as perceived by a reasonable person," and 2) the employer did so "with the intention of forcing the employee to quit . . . ." *Moore v. Kuka Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999); *Logan*, 259 F.3d at 568-69.

Waddell has directed the Court to no part of the pleadings or any other evidentiary support to show that the monkey picture was left by a superior, any of the defendants, or anyone else within the purview of MUO's responsibility, or that anyone knew about the picture until he reported it. Waddell Depo. II at 100-03. He has also not shown it to have been any more than an isolated incident, and has not established that it was intended to have racial undertones or harassing intentions. In fact, upon reporting it to Hancock, Waddell asked that no further action be taken. *Id*.

Rather, Waddell's argument would be that the adverse employment action consisted of his being pressured by superiors to be vocal during the CARB hearings and to appear before the

12

OCRC in defense of the terminations, even though he did not himself fire the custodians as he was on medical leave at the time.[2] Plaintiff would argue that such actions were deliberate and constituted intolerable working conditions. Those actions, however, do not rise to the level of intolerable working conditions. Furthermore, Plaintiff cannot show that these actions were taken with the intention of forcing Waddell to quit. Even at the point where MUO wanted to replace Waddell as Director of Environmental Services, MUO had decided to give Waddell another position with comparable salary and benefits. Plaintiff has produced no evidence, nor has he directed the Court to any support in the pleadings, depositions, or exhibits, to suggest that such was not MUO's intentions and plans. He therefore would not be able to establish pretext, even if he could establish an adverse employment action.

Waddell also argues that his lack of a raise during the mid-2004 salary evaluations was an adverse employment action. Elements of proof of pay discrimination are similar under Title VII and the Equal Pay Act, *Buntin v. Breathitt County Board of Educ.*, 134 F.3d 796, 801 (6th Cir. 1981), the exception being that the burden shifts to the employer in an EPA case after a prima facie case is established. *Id.* at 799; *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993). The plaintiff must show that an employer paid different wages to an employee of another race for substantially equal work to establish a prima facie case in EPA claims. The positions must involve a "substantial equality of skill, effort, responsibility and working conditions." *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981).

---

[2] The placing of the ad in the Toledo Blade for Waddell's replacement occurred before Waddell filed his first discrimination claim, so it cannot be considered retaliatory. It is discussed herein as an independent basis for Plaintiff's claim for constructive discharge.

13

Waddell did receive a raise of 5% in 2003 and two of 2% each in 2004 and 2005. Even if his lack of an extra raise in 2004 were to be considered an adverse employment action, he cannot demonstrate that MUO's reasons for his salary level -- that he was already in the 80th percentile compared to other institutions, which was the percentile to which other salaries were raised, and other directors at MUO had more degrees and supervised more technical employees than Waddell -- constituted discriminatory pretext. MUO set Waddell's salaries, in addition to those of other supervisors and directors, based on a market rate survey. Employers are generally justified in relying on such studies. *See Cooper v. Southern Co.*, 390 F.3d 695, 736 (11th Cir. 2004); *Collins v. Landmark Military Newspapers, Inc*., 2007 U.S. Dist. LEXIS 57572 (E.D. Va. 2007) ("An employer may consider the market place value of the skills of a particular individual when determining his or her salary."); *EEOC v. TXI Operations, L.P.*, 394 F. Supp.2d 868, 879 n.11 (N.D. Tex. 2005), quoting *Horner v. Mary Inst*., 613 F.2d 706, 714 (8th Cir. 1980); *Minor v. Alcatel USA Resources, Inc.*, 2007 U.S. Dist. LEXIS 36233 (E.D. Tex. 2007). Plaintiff has not put forth any evidence or otherwise given the Court reason to doubt that the salary information in the study was gathered accurately or that it was applied at MUO properly and in good faith. Therefore, the Court accepts MUO's position on the issue of salary discrimination, because Waddell can neither show a prima facie case nor a pretext for pay discrimination.

MUO distinguished Waddell's pay from that of other supervisors at MUO based on differences in skill, effort, responsibility, and working conditions. One potentially comparable person is Richard Helvey, Waddell's predecessor in the same position, who was paid more than Waddell. MUO submits that Helvey had been in the position nine years when he left, while Waddell was in the position for at least two to three years fewer. As to other directors at MUO

14

receiving higher pay than Waddell, he has not shown that MUO paid more to anyone who was similarly situated. MUO argues that those directors were paid more because they had more degrees and supervised more highly technical employees in more technical tasks. Plaintiff has not shown that these reasons may have been pretextual.

Plaintiff's claims under Title VII for employment discrimination and retaliation cannot survive Defendant's motion for summary judgment.

### 2. Constructive discharge

Plaintiff also alleges constructive discharge as a distinct claim. A constructive discharge claim is a specialized kind of hostile work environment claim, *Penn State Police v. Suders*, 542 U.S. 129, 133 (2004), and requires the plaintiff to show that he was (1) subjected to unwelcome harassment (2) based on his race (3) that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Such claim "is cognizable only if the purported harassment, viewed in conjunction with all of the circumstances, occurred because of the employee's protected status." *Michael v. Caterpillar Financial Services Corp.*, 496 F.3d 584, 600 (6th Cir. 2007). The conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard the environment as such. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993). "Harassing" behavior not motivated by the victim's protected status is not to be considered in determining whether a hostile environment exists. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463-64 (6th Cir. 2000).

"To demonstrate a constructive discharge, [a] plaintiff must adduce evidence to show that 1) 'the employer … deliberately created intolerable working conditions, as perceived by a

15

reasonable person,' and 2) the employer did so 'with the intention of forcing the employee to quit' … 'To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined.'" *Logan v. Denny's, Inc*., 259 F.3d 558, 568-69 (6th Cir. 2001), quoting *Moore v. Kuka Welding Sys*., 171 F.3d 1073, 1080 (6th Cir. 1999); *see also, Policastro v. Northwest Airlines, Inc*., 297 F.3d 535, 539 (6th Cir. 2002).

"This heightened constructive discharge standard requires an objective assessment of the employee's feelings, and an inquiry into the employer's intent and the foreseeability of the impact its conduct had on the employee." *Peters v. Lincoln Elec. Co.*, 285 F. 3d 456, 478 (6th Cir. 2002). In establishing the objective nature of the constructive discharge, the plaintiff must show that "the abusive working environment became so intolerable that her resignation qualified as a fitting response." *Suders*, 542 U.S. at 134. The Sixth Circuit has considered certain factors when determining whether the employer deliberately created intolerable conditions:

> Whether a reasonable person would have felt compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Logan*, 259 F.3d at 569 (adopting the factors listed in *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)).

In Waddell's case, he could argue that a constructive discharge claim flows from the advertisement in the Toledo Blade for his position appearing before he had been informed of the decision to advertise for a replacement. However, MUO asserts that the intended plan was to reassign him with at least the same pay and benefits to another position -- not to fire him or force

16

him to quit. Plaintiff has presented no evidence to the effect that the new position would have been a demotion or required menial or degrading work. Without such support, Plaintiff cannot sustain his claim on this basis.

The Court is also cognizant of the previously discussed argument, which may also support an independent discharge claim, that the monkey picture, pressuring Waddell at the CARB hearing, and sending him to the OCRC hearing contributed to his reasonable fear for his job. Neither of these actions by Defendants, however, involved demotion, reduction in pay or responsibility, reassignment to lesser work or work under a younger supervisor, or offers of early retirement. They also do not reach the level of badgering, harassment, or humiliation calculated to encourage Waddell to resign necessary to maintain a claim of constructive discharge.

Further, even if a reasonable person would take these incidents to constitute intolerable working conditions, Plaintiff has failed to show that MUO's intent was for Waddell to quit. Waddell argues that he was kept on board as an African-American "face" to the 70% African-American Environmental Services Department. The person who replaced him, at least on an interim basis, was also African-American. Most importantly, nothing that MUO or the individual defendants asked was outside the expected duties of Waddell as Director of Environmental Services. Although he was not at work when the employees were fired, he remained director of the department in which they worked. Waddell regularly attended CARB hearings for his subordinates, as he did for the eight custodial workers. Waddell Depo. at 51-52. He attended the OCRC hearing as Director of their Department, even if he could not answer all the questions posed to him by the OCRC board. These are expected and normal duties of a supervisor. Plaintiff

17

has not shown that Defendants' actions rise to the level required for a constructive discharge claim.

### B. Claims against the individual defendants

Waddell alleges individual liability under 42 U.S.C. §§ 1981, 1983, 1985, and 1986 against Logie, Leonard, and Hancock. His claims under §1981 are reflective of his discrimination claims against MUO. His §1983 claim alleges that Defendants acted under color of state law to discriminate against, constructively discharge, and unequally pay him. Plaintiff's §§1985 and 1986 claims allege that the individual defendants conspired to accomplish or fail to prevent the alleged discrimination.

These claims are generally parallel to the claims against MUO discussed above. Most of the actions in question were taken by the individual defendants as Waddell's superiors at MUO. The Court is therefore compelled to grant summary judgment on these claims on the same bases and for the same reasons as the same is granted on the claims against MUO.

## IV. Conclusion

For the reasons discussed above, Defendants' motion for summary judgment is hereby granted. (Doc. 30.) The case is dismissed.

IT IS SO ORDERED.

    s/ *David A. Katz*
    DAVID A. KATZ
    U. S. DISTRICT JUDGE